

**FILED**

FEB 0 5 2016

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| SILVER NICOLICE MCCLANAHAN, | 4:13-CV-04140-RAL |
| Plaintiff, | |
| vs. | OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| DARIN YOUNG, WARDEN OF SDSP; JENNIFER WAGNER, ASSOCIATE WARDEN OF SECURITY; ART ALLCOCK, LIAISON FOR DCI; AND KEITH DITMANSON, UNIT MANAGER, | |
| Defendants. | |

Plaintiff Silver Nicolice McClanahan, an inmate at the South Dakota State Penitentiary (SDSP), is suing the Defendants, four staff SDSP staff members, under 42 U.S.C. § 1983. Doc. 1. McClanahan alleges that the Defendants violated his rights under the Eighth and Fourteenth Amendments by forcing him to wear leg irons in a shower and recreation cage. Doc. 1. The Defendants moved for summary judgment, Doc. 33, which McClanahan opposed, Doc. 48. For the reasons explained below, this Court grants the Defendants' motion for summary judgment.

**I. Facts**

The Defendants complied with Local Rule 56.1(A) of the Civil Local Rules of Practice of the United States District Court for the District of South Dakota by filing a statement of material facts along with their motion for summary judgment. Doc. 42. Local Rule 56.1(B) requires the party opposing a motion for summary judgment, to "respond to each numbered paragraph in the

1

moving party's statement of material facts with a separately numbered response and appropriate citations to the record." D.S.D. Civ. LR 56.1(B). All material facts that are not disputed by the nonmoving party are deemed admitted. D.S.D. Civ. LR 56.1(D). McClanahan filed a verified complaint, affidavits, and two notarized statements, but did not file a response under Local Rule 56.1(B). Mindful of McClanahan's pro se status and that "facts alleged in a verified complaint need not be repeated in a responsive affidavit in order to survive summary judgment," Roberson v. Hayti Police Dep't, 241 F.3d 992, 994–995 (8th Cir. 2001), this Court has pieced together McClanahan's version of the facts from the verified complaint, the affidavits, and the notarized statements. Those portions of the Defendants' statement of material facts that do not conflict with McClanahan's filings are deemed admitted.

McClanahan is serving a life sentence at the SDSP for the 1994 killing of Ronald Brodersen. Doc. 42 at ¶¶ 1–3; Doc. 34-1; State v. Lemley, 552 N.W.2d 409, 411 (S.D. 1996). McClanahan, accompanied by his friend Harold Lemley, struck Brodersen with a hammer at least twelve times, after which Lemley tightened an electrical cord around Brodersen's neck. Doc. 42 at ¶¶ 2–3; Lemley 552 N.W.2d at 411. McClanahan and Lemley both pleaded guilty to first-degree manslaughter. Doc. 42 at ¶ 1; Doc. 34-1; Lemley 552 N.W.2d at 411.

All of the Defendants in this case work at the SDSP. Defendant Darin Young is the warden, Defendants Jennifer Wagner and Art Allcock are associate wardens, and Defendant Keith Ditmanson is the unit manager of the Special Housing Unit (SHU). Doc. 42 at ¶¶ 4–7.

In 1999, McClanahan was written up for attempted escape after he and two other inmates were discovered hiding in a blind spot in the prison's bakery. Doc. 42 at ¶¶ 39–40. Although McClanahan told prison officials that he was "not necessarily hiding," a disciplinary hearing

officer found McClanahan guilty and sentenced him to ninety days in segregation. Doc. 42 at ¶¶ 40–41.

In late June 2013, McClanahan was overheard telling another inmate that the "Number one rule of thumb is the only kind of Pig is a dead pig." Doc. 42 at ¶ 84. Around this same time, security staff at the SDSP became concerned that McClanahan was plotting to escape from prison. Doc. 42 at ¶ 16. Staff learned from listening to McClanahan's telephone calls that he had been transferring money to current and former SDSP inmates, including a recent parolee named Lloyd White Face. Doc. 42 at ¶¶ 16, 25–27. Staff also overheard telephone calls between McClanahan and his girlfriend, Jamie Klinghagen. Doc. 42 at ¶ 17. Klinghagen used to work at the SDSP, but was terminated when her relationship with McClanahan was discovered. Doc. 42 at ¶ 17. She remained in contact with McClanahan after her termination, speaking with him on the phone and sending him substantial amounts of money. Doc. 42 at ¶¶ 21–22, 24–25.

On the morning of June 25, 2013, SDSP security staff learned some disturbing information while listening to prerecorded telephone calls between Klinghagen and McClanahan. Doc. 42 at ¶¶ 28–29; Doc. 40 at ¶ 12; Doc. 34-4. Only a few days before, Klinghagen had told McClanahan that she was getting organized for a trip and that she had purchased several items for him, including button down shirts and "gum."[1] Doc. 42 at ¶¶ 28–29; Doc. 34-4.

As security staff was listening to these phone conversations, McClanahan reported to health services complaining of severe abdominal pain. Doc. 42 at ¶ 34; Doc. 34-4. He submitted a viscous, blood-like urine sample that the health services staff did not see him provide. Doc. 42 at ¶¶ 35, 43–44. Although McClanahan clutched his right side and complained of extreme pain while being examined, a health services staff member observed him standing upright and in no

---

[1] The Defendants believe that the word "gum" referred to a gun. Doc. 42 at ¶ 29.

apparent distress after she returned from taking his blood to the lab.  Doc. 42 at ¶¶ 51–52; Doc. 37 at ¶¶ 9–10.  McClanahan also declined to provide a urine sample in front of a corrections officer as requested, opting instead to go to the bathroom and provide the sample on his own. Doc. 42 at ¶¶ 47, 48.  When McClanahan returned from the bathroom, his IV tube was backed up to the drip chamber with blood, which was consistent him having removed the tube.  Doc. 42 at ¶¶ 48–49.  The sample McClanahan submitted was of the same viscosity as the first sample. Doc. 42 at ¶ 48.  McClanahan refused further treatment after he was asked to undergo additional urine testing.  Doc. 42 at ¶ 50.

Later on the morning of June 25, 2013, security staff learned of McClanahan's trip to health services.  Doc. 42 at ¶ 32–33; Doc. 40 at ¶¶ 15–17.  A security staff supervisor ordered that McClanahan be located and secured immediately.  Doc. 42 at ¶ 53.  That same day, staff issued a disciplinary report charging McClanahan with attempted escape and an administrative detention order placing him in the SHU pending an investigation.  Doc. 42 at ¶¶ 54, 58; Docs. 34-2, 34-10.  Before transporting McClanahan to the SHU, staff searched him and found a Visine bottle filled with a mixture of urine and blood.  Doc. 42 at ¶ 55.  Staff believed that McClanahan had attempted to use the contents of the Visine bottle as his urine sample.  Doc. 42 at ¶ 56.

A later investigation revealed that McClanahan had enlisted Klinghagen and White Face to help him escape from prison.  Doc. 42 at ¶¶ 59–70.  McClanahan's plan was to fake an illness on the morning of June 25, 2013, so that SDSP staff would transport him outside the penitentiary for medical treatment.  Doc. 42 at ¶ 59; Doc. 39 at ¶ 5.  White Face and another individual would then ambush the transport van, "take out" the correctional officers, and escape with McClanahan. Doc. 42 at ¶¶ 60, 62, 69.  Klinghagen admitted to the police that she had purchased several items that were to be used as part of the escape plan, including a U.S. Marshal badge, a bullet proof

4

vest, hair dye, handcuffs, and numerous flashbangs. Doc. 42 at ¶ 63. Klinghagen further admitted that she had recently purchased a .223 caliber rifle, a .308 caliber rifle, a 12 gauge shotgun, two 9 mm pistols, and two .45 caliber pistols. Doc. 42 at ¶ 64–67. When questioned about this arsenal of weapons, White Face told law enforcement that he was to be armed with several guns when following the transport van. Doc. 42 at ¶ 68. Once the transport van had been taken out, White Face was to give McClanahan a .308 caliber AR-15 rifle. Doc. 42 at ¶ 69. For her role in the escape plan, Klinghagen was charged with conspiracy to commit aggravated assault on law enforcement officers, aiding and abetting an attempted escape, and the commission of a felony with a firearm. Doc. 42 at ¶ 73. She ultimately pleaded guilty to the conspiracy charge. Doc. 42 at ¶ 74. McClanahan, who was charged with attempted escape and conspiracy to commit aggravated assault on a law enforcement officer, pleaded guilty to attempted escape. Doc. 42 at ¶¶ 71–72.

The dispute in this case arises out of McClanahan's allegations that during June and July of 2013, he was forced to wear leg irons while in the SHU's shower and recreation cage, despite complaining of "open, bleeding wounds" to his ankles. McClanahan was transferred to the SHU on June 25, 2013, as a result of his escape attempt. Doc. 42 at ¶ 54. SDSP policy requires that inmates in the SHU wear handcuffs and leg irons when being transported on the unit, and be accompanied by at least one correctional officer. Doc. 42 at ¶¶ 76–77. SDSP policy allows the "Deputy Warden or his designee" to "authorize additional restraints on a case by case basis." Doc. 42 at ¶ 77. A security memo issued on June 28, 2013, provided in relevant part:

> Effective immediately, with the pending case against inmate McClanahan, . . . there will [be] alterations to a few of our policies and procedures in the hill SHU. Prior to inmate McClanahan moving, either Major Van Vooren or AW Allcock must be contacted so they can approve the move. Inmate McClanahan will have an escort of no less than 2 officers along with 1 OIC

> whenever his cell door is opened. While on the unit McClanahan's restraints will consist of (1) pair of handcuffs with leash and (1) pair of leg irons with leash, both top locked. While being moved **officers will maintain positive control of his restraints** (hands on) **at all times**. While off the unit inmate McClanahan's restraint status may change however **officers will still maintain positive control of him at all times.**

Doc. 42 at ¶¶ 80–83; Doc. 34-17.[2]

According to Defendants' statement of material facts and accompanying affidavits, some SHU staff members mistakenly believed that the security memo required McClanahan to wear leg irons when he was inside the SHU's shower and recreation cage. Doc. 42 at ¶¶ 107–111. SHU staff member Brandon Knutson stated in an affidavit that he observed McClanahan wearing leg irons inside the shower and recreation cage on or about July 15, 2013. Doc. 42 at ¶ 107; Doc. 38 at ¶¶ 13–15.[3] Knutson questioned other SHU staff members and discovered that there was a "misunderstanding" concerning the security memo. Doc. 42 at ¶ 108; Doc. 38 at ¶ 14. According to Knutson and Ditmanson, Knutson discussed the matter with Ditmanson that same day after which the two immediately directed staff to stop making McClanahan wear leg irons inside the shower and recreation cage. Doc. 42 ¶ at 109; Doc. 36 at ¶ 23; Doc. 38 at ¶ 15. An

---

[2]Although the security memo is dated September 4, 2013, Defendants have explained that an auto-formatting function on the memo template automatically changes to the current date whenever the memo is opened for review or printing. Doc. 36 at ¶ 10. Defendants have filed an email showing that the security memo was sent on June 28, 2013. Doc. 34-24.

[3]It is not entirely clear precisely when Knutson observed McClanahan wearing leg irons in the shower and recreation cage. Defendants' statement of material facts say that Knutson made the observation on July 15, 2013, Doc. 42 at ¶ 107, but Knutson's own affidavit is less definitive, stating that he spoke to Ditmanson about McClanahan's restraints on July 15, but not specifically identifying when he observed McClanahan wearing leg irons in the shower and recreation cage, see Doc. 38 at ¶¶ 13–15. In their answer to McClanahan's complaint, the Defendants stated the following: "A staff member, upon noticing that Inmate McClanahan was wearing leg shackles inside the rec cage on or about July 12, 2013, undertook to question officers assigned to the SHU regarding those restraints. It was discovered, at that time, that there was an apparent misunderstanding as to when, pursuant to the aforementioned Memo, McClanahan was required to be in restraints while on the unit." Doc. 17 at 8.

updated memo was issued on July 17, 2013, clarifying that SHU staff should remove McClanahan's leg irons when he was in the shower and recreation cage. Doc. 42 at ¶ 110–111; Doc. 36 at ¶ 23; Doc. 38 at ¶ 16; Doc. 34-18.[4]

McClanahan has alleged that he had "open, bleeding wounds" on his ankles and complained about these wounds, but Defendants dispute this. An SDSP staff member swore in an affidavit that McClanahan never sought medical attention for the "open, bleeding wounds to his ankles." Doc. 42 at ¶¶ 94, 103; Doc. 35 at ¶¶ 5, 9. Although McClanahan saw health services on September 25, 2013, the records from this appointment do not mention any wounds or scarring to his ankles. Doc. 42 at ¶ 102; Doc. 35 at ¶ 6. Knutson and Ditmanson state in their affidavits that McClanahan's alleged wounds were not visible to their naked eyes, and that McClanahan never complained to them about "open, bleeding wounds to his ankles." Doc. 42 at ¶ 99; Doc. 36 at ¶ 18; Doc. 38 at ¶¶ 18, 23. Knutson and Ditmanson further state that if they or any other SHU staff member had known of open, bleeding wounds to McClanahan's ankles, they would have secured medical attention for McClanahan and requested that the use of leg irons on McClanahan be modified. Doc. 42 at ¶ 98; Doc. 36 at ¶ 17; Doc. 38 at ¶ 22. According to Ditmanson, the only complaint he received from McClanahan "was limited to his having to wear the ankle restraints to begin with." Doc. 42 at ¶ 100; Doc. 36 at ¶ 19. The only "injury" Ditmanson observed was some minor redness to McClanahan's ankles, for which McClanahan was allowed to wear socks under his leg irons. Doc. 42 at ¶¶ 100–101; Doc. 36 at ¶ 19. Ditmanson in his affidavit did not state when McClanahan made his complaint, when Ditmanson

---

[4]The updated memo is dated July 23, 2014, but this is the result of the auto-formatting function on the memo template. Doc. 36 at ¶¶ 10, 24. Defendants have filed an email showing that the updated memo was sent on July 17, 2013. Doc. 34-25.

observed the redness on McClanahan's ankles, and when McClanahan was allowed to wear

socks.

McClanahan offers a different version of the facts. In Count I of his verified complaint,

he alleges:

> It is known fact that threats to safety are not tolerated I was left
> threatened by Mr D Young, Mrs Wagner, Mr Allclck [sic] and Mr
> K Ditmanson because at no time were any of these individuals
> unaware of the threats and actions of my situation. During these
> moments and Days of torture and terror and wounds to my body I
> made numerous verbal and by showing my injuries my complaints
> to all of these staff. To no avail.

Doc. 1 at 4. In Count II, McClanahan alleges:

> Mr Young, Mrs Wagner, Mr Allclck [sic] and Mr. Ditmanson were
> all aware of what their staff was physically doing. It was ordered
> and followed through the chain of comand [sic] begining [sic] with
> Mr Young. I was forced to wear restraints inside a secure locked
> Rec/Shower Enclosure, forced to wear during Rec and Shower
> Causing open bleeding wounds obvious to the naked eyes due to
> having restraints on and placed before Recing/Showering [sic]. On
> numerous occasions I verbally complained to officers to no avail.
> There [sic] comments being it was not there [sic] call and they
> were following orders given to them by individuals above. The
> Defendants above named knew it made the actions highly
> foreseeable as to injuries.

Doc. 1 at 5.

Count III of McClanahan's verified complaint contains similar allegations:

> As a direct result from Mr Young, Mrs Wagner, Mr Allclck [sic]
> and Mr Ditmansons [sic] actions and Neglect I suffered open
> bleeding wounds with permanent Scaring [sic]. . . . My injuries
> were obvious to any staff member who at any time escorted me or
> removed me from my cell.  I verbally on numerous times
> complained to all staff to no avail Resulting in injury.

Doc. 1 at 6. Finally, McClanahan in the facts section of his verified complaint alleges:

> I on numerous occasions "showed" and verbally complained to
> officers present about my injuries and asked for help and for it to

8

> stop. To no avail. The response from the officers every time being
> They were following Orders. All of my movement at any time has
> been recorded on record such as times and dates. Any and all
> ranking officers present during these times were made aware of my
> situation [sic] and injuries that were obvious to the naked eye due
> to the fact the officers present had to place shackles on me to move
> me from cell to the recreation, shower enclosure. . . . I on
> numerous occasions asked respectfully to have health service help
> or treat my wounds and my requests were always ignored by
> officers.

Doc. 1 at 9. McClanahan's verified complaint states that he was required to wear leg irons in the

shower and recreation cage for "weeks," but does not otherwise clarify the time frame during

which this occurred. Doc. 1 at 8. In an "Informal Resolution Request" that he completed in

early October 2013, McClanahan stated that he was forced to wear leg irons in the shower and

recreation cage from June 25, 2013 until July 16, 2013. Doc. 19-1 at 3.[5]

In support of the allegations in his verified complaint, McClanahan submitted notarized

statements from inmates Leonard Poor Bear and Carlos Green. Doc. 19-1 at 1–2. Poor Bear

wrote that when he was in the SHU from July 2, 2013 to July 8, 2013, he observed McClanahan

being forced to wear leg irons in the recreation cage, despite McClanahan telling the "OIC's [sic]

that they where [sic] cutting into his ankles, causing injury." Doc. 19-1 at 1. According to Poor

Bear, McClanahan complained to Knutson, who responded that although McClanahan was being

treated unjustly, it "wasn't [Knutson's] call." Doc. 19-1 at 1. Green wrote that he witnessed

McClanahan being made to "shower and spend his hour rec. period in shackles" every day from

the "last half of June until July 14," when Green was released from the SHU. Doc. 19-1 at 2. In

---

[5]In his brief in opposition to Defendants' motion for summary judgment, McClanahan alleges
that he was forced to wear leg irons in the shower and recreation cage from June 26, 2013 until
July 28, 2013. Doc. 48 at 7. This allegation is insufficient to establish a genuine dispute of
material fact concerning the time frame during which he was required to wear leg irons in the
shower and recreation cage. See S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)
v. Walter Kidde & Co., 690 F.2d 1235, 1238 (9th Cir. 1982) ("[A] party cannot manufacture a
genuine issue of material fact merely by making assertions in its legal memoranda.").

Green's account, he mentioned McClanahan's situation to "Captain Mary Rodowski," but was told to mind his own business. Doc. 19-1 at 2.

McClanahan also submitted affidavits from David Palmer, the attorney who represented him in the escape and conspiracy case, and from Tim Mulloy, the private investigator who assisted Palmer. Docs. 25, 26. Palmer and Mulloy visited McClanahan in the SHU on July 30, 2013. Doc. 25 at ¶¶ 4–7; Doc. 26 at ¶¶ 4–7. According to Palmer, McClanahan had bruising and scabs on his ankles "in the proximity of the leg irons he was wearing." Doc. 25 at ¶ 7. Similarly, Mulloy attested that he observed "redness, swelling, irritation, and scabs on both of Mr. McClanahan's ankles in the proximity of the leg irons he was wearing." Doc. 26 at ¶ 7.

McClanahan filed this § 1983 action in December 2013. Doc. 1. McClanahan's verified complaint contains three separate counts, all of which arise out of McClanahan having to wear leg irons in the shower and recreation cage, and all of which allege that the Defendants violated his rights under the Eighth and Fourteenth Amendments of the United States Constitution. Doc. 1 at 4–6. This Court construes McClanahan's verified complaint as raising an Eighth Amendment conditions-of-confinement claim, an Eighth Amendment excessive force claim, and a Fourteenth Amendment due process claim. McClanahan seeks compensatory and punitive damages. Doc. 1 at 7. He also requests an order protecting him from retaliation for filing this suit and an order "for protection against unusual punishment restraints at any time inside a secure locked Rec/shower enclosure, unless person/s is physically violent, towards staff." Doc. 1 at 7.

## II. Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(a) places the burden

10

initially on the moving party to establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, the nonmoving party must establish that a material fact is genuinely disputed either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B). In ruling on a motion for summary judgment, the facts and inferences fairly drawn from those facts are "viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).

## III. Analysis

Under § 1983, state officials may be sued in their individual capacities, their official capacities, or both. Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999). Here, McClanahan is suing Defendants Young, Wagner, and Allcock in both their official and individual capacities, but is only suing Defendant Ditmanson in his official capacity. Doc. 1 at 2. As explained more fully below, individual and official capacity suits differ in both their pleading requirements and the defenses available to the official. See Hafer v. Melo, 502 U.S. 21, 25 (1991). Because of these differences, this Court will analyze McClanahan's individual capacity and official capacity claims separately.

### A. Individual Capacity Claims against Defendants Young, Wagner, and Allcock

Qualified immunity is one of the defenses available to state officials sued in their individual capacities under § 1983. "Qualified immunity shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Partlow v.

11

Stadler, 774 F.3d 497, 501 (8th Cir. 2014). Courts use a two-step inquiry to determine whether qualified immunity applies: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." Id. "Government officials are entitled to qualified immunity '[u]nless both of these questions are answered affirmatively.'" Greenman v. Jessen, 787 F.3d 882, 887 (8th Cir. 2015) (alterations in original) (quoting Nord v. Walsh Cty., 757 F.3d 734, 738 (8th Cir. 2014)). A § 1983 claim cannot be based upon vicarious liability. Kulow v. Nix, 28 F.3d 855, 858 (8th Cir. 1994). That is, "a general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability" for an alleged constitutional violation. Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995). Thus, this Court must consider whether "each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).

## 1. Eighth Amendment Claims

To succeed on an Eighth Amendment claim, a prisoner must show 1) that the alleged deprivation was objectively serious enough to amount to a constitutional violation and 2) that the defendants had a sufficiently culpable state of mind. Farmer v. Brennan, 511 U.S. 825, 834 (1994); Hudson v. McMillian, 503 U.S. 1, 7–9 (1992). The first element is objective, while the second element is subjective. Wilson v. Seiter, 501 U.S. 294, 298 (1991). The proof necessary to meet the two elements of an Eighth Amendment violation depends on the type of claim alleged. Hudson, 503 U.S. at 5–9; Irving v. Dormire, 519 F.3d 441, 446 (8th Cir. 2008). Here, McClanahan raises a conditions-of-confinement claim and an excessive force claim.

### a) Conditions-of-Confinement Claim

A conditions-of-confinement claim like the one McClanahan raises has two elements. First, McClanahan must show that his conditions of confinement subjected him to a substantial risk of serious harm. Farmer, 511 U.S. at 828, 834, 837. Only "extreme deprivations," meaning the denial of "the minimal civilized measure of life's necessities," are sufficient to satisfy the objective component of a conditions-of-confinement claim. Hudson, 503 U.S. at 9 (quotation and internal quotation marks omitted). Second, McClanahan must show that Defendants acted with deliberate indifference to the risk posed. Farmer, 511 U.S. at 834. "A prison official is deliberately indifferent if she 'knows of and disregards' . . . a substantial risk to an inmate's health or safety." Nelson v. Corr. Med. Servs., 583 F.3d 522, 528–29 (8th Cir. 2009) (en banc) (quoting Farmer, 511 U.S. at 837). "[D]eliberate indifference includes something more than negligence but less than actual intent to harm; it requires proof of a reckless disregard of the known risk." Reynolds v. Dormire, 636 F.3d 976, 979 (8th Cir. 2011) (alteration in original) (quoting Crow v. Montgomery, 403 F.3d 598, 602 (8th Cir. 2005)). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . ." Farmer, 511 U.S. at 842.

Defendants contend that they are entitled to summary judgment because there is no evidence that they were deliberately indifferent to a substantial risk of serious harm to McClanahan. Deliberate indifference is an essential element of McClanahan's conditions-of-confinement claim and he would bear the burden of proving this element at trial. Accordingly, McClanahan cannot survive the Defendants' properly supported motion for summary judgment unless he presents evidence sufficient to establish that there is a genuine issue of material fact concerning whether the Defendants were deliberately indifferent. Celotex, 477 U.S. at 322–323; Burns v. Eaton, 752 F.3d 1136, 1139 (8th Cir. 2014). To establish a genuine dispute on the issue

13

of deliberate indifference, McClanahan must present evidence that would allow "a reasonable jury [to] return a verdict" in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Conclusory, non-specific statements in an affidavit or verified complaint do not meet this standard. Chavarriaga v. N.J. Dep't of Corr., 806 F.3d 210, 222 (3d Cir. 2015) (affirming summary judgment in favor of attorney general and commissioner of corrections because the plaintiff "did not describe their conduct in sufficient detail to support her conclusory allegations that they had either actual or contemporaneous knowledge of or any personal involvement in any violation of her constitutional rights"); Rose-Maston v. NME Hosps., Inc., 133 F.3d 1104, 1109 (8th Cir. 1998) ("Conclusory affidavits, standing alone, cannot create a genuine issue of material fact precluding summary judgment."). Nor is the nonmoving party's production of a mere "scintilla of evidence" in support of his claim sufficient to avoid summary judgment. Anderson, 477 U.S. at 252; see also Matsushita, 475 U.S. at 586 (explaining that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

A careful review of the record shows that McClanahan has failed to offer sufficient evidence that the Defendants were deliberately indifferent. To begin with, the allegations in McClanahan's verified complaint that the Defendants ordered that he wear leg irons in the shower and recreation cage do not, standing alone, demonstrate that the Defendants were deliberately indifferent to a substantial risk to McClanahan's safety. See Sanders v. Hopkins, No. 97-3082, 1997 WL 755276, at *2 (10th Cir. Dec. 5, 1997) (unpublished decision) ("Requiring an inmate who is in disciplinary segregation to shower in handcuffs and ankle shackles does not evince deliberate indifference to an inmate's health or safety."); Branham v. Meachum, 77 F.3d 626, 631 (2d Cir. 1996) (requiring an inmate on lockdown to shower while wearing leg irons does not state a conditions-of-confinement claim under the Eighth

14

Amendment); LeMaire v. Maass, 12 F.3d 1444, 1457 (9th Cir. 1993) (prison officials' decision to shackle dangerous inmate in shower did not violate the Eighth Amendment); Dawes v. Coughlin, 964 F. Supp. 652, 658–59 (N.D.N.Y. 1997) (finding no Eighth Amendment violation where inmate was required to wear full restraints during exercise period).

Next, even assuming that requiring McClanahan to wear leg irons in the shower and recreation cage after he developed "open, bleeding wounds" to his ankles presented a serious risk of harm, McClanahan has failed to offer sufficient evidence that Defendants Young, Wagner, and Allcock knew of this risk and disregarded it. Indeed, the closest McClanahan comes to providing evidence that Defendants Young, Wagner, and Allcock were aware of the alleged "open, bleeding wounds" to his ankles is Count I of the verified complaint:

> It is known fact that threats to safety are not tolerated I was left threatened by Mr D Young, Mrs Wagner, Mr Allclck [sic] and Mr K Ditmanson because at no time were any of these individuals unaware of the threats and actions of my situation. During these moments and Days of torture and terror and wounds to my body I made numerous verbal and by showing my injuries my complaints to all of these staff. To no avail.

Doc. 1 at 4. This statement lacks sufficient detail to create a genuine dispute concerning whether Young, Wagner, and Allcock knew of and disregarded the alleged "open, bleeding wounds" to McClanahan's ankles. McClanahan did not explain when he complained to these Defendants, what he said to these Defendants, or how these Defendants responded. Nor did McClanahan explain how Young, the warden, and Wagner and Allcock, the assistant wardens, came to be in the SHU such that he could make a face-to-face complaint and show them his alleged wounds. And while McClanahan has offered evidence that Knutson and other unnamed SHU staff members may have known of his wounds, this knowledge cannot be imputed to Young, Wagner, or Allcock for purposes of a claim of deliberate indifference. See Burnette v. Taylor, 533 F.3d

15

1325, 1331 (11th Cir. 2008) ("[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference."); Whiting v. Marathon Cty. Sheriff's Dep't, 382 F.3d 700, 704 (7th Cir. 2004) ("Farmer, since it requires the defendant-official to have actual knowledge of the risk, foreclosed imputed knowledge as the basis for an Eighth Amendment claim of deliberate indifference.").

McClanahan appears to suggest that Young was aware of the alleged wounds to his ankles because McClanahan submitted an "Informal Resolution Request" complaining about the wounds. Doc. 48 at 13. McClanahan did not submit this request until October 3, 2013, however. Doc. 19-1 at 3. The affidavits from Ditmanson and Knutson and McClanahan's statement in the request establish that July 16, 2013 was the absolute latest that McClanahan was required to wear leg irons in the shower and recreation cage. Thus, McClanahan's request did not make Young aware of any ongoing risk to McClanahan's health or safety, let alone establish Young's deliberate indifference.

McClanahan argues also that the Defendants violated the Eighth Amendment by failing to train their subordinates. The Defendants may be liable for a failure to train if (1) the South Dakota Department of Corrections' (DOC) training practices concerning the use of restraints were inadequate; (2) the Defendants' failure to train reflects a deliberate and conscious choice; and (3) an alleged inadequacy in the DOC's training actually caused McClanahan's injuries. Ambrose v. Young, 474 F.3d 1070, 1079 (8th Cir. 2007). To establish liability under a failure-to-train theory, McClanahan must show that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that [the Defendants] can reasonably be said to have been deliberately indifferent to the need." Id. (quotation and internal quotation marks omitted).

16

McClanahan does not offer any evidence of prior misuses of restraints that could be deemed to have put the Defendants on notice that more training was necessary. Rather, it appears that he is attempting to show deliberate indifference by pointing to deficiencies in the DOC's training program. According to McClanahan, the DOC's training policy requires that staff members "be provided access and or will receive" training on the operational memorandums applicable to their duties.[6] Doc. 48 at 3. He asserts that staff members are required to review and sign an acknowledgment that they are aware of and agree to abide by the operational memorandums that apply to them. Doc. 48 at 3. McClanahan contends that this training policy is deficient because staff members are not given a "sheet" describing prisoners' rights and are not trained that they can question their superiors if they believe an inmate is in danger. These alleged deficiencies are not so likely to result in constitutional violations that the Defendants can be said to have been deliberately indifferent to the need for more training. The SDSP's operational memorandums and the DOC's policies not only forbid the use of restraints as a punishment or in a manner that causes undue pain but also instruct that restraint requirements may be altered for medical reasons. Doc. 42 at ¶¶ 92, 97. If McClanahan's characterization of the DOC's training procedure is correct, then SHU staff members would have been given access to and received training on these memorandums and policies. Giving staff members a "sheet" on prisoners' rights and informing them that they can speak with their superiors about inmate safety would have added little, if anything, to the existing staff training program.

---

[6]The training policies of the SDSP and DOC are not part of the record. McClanahan alleges in his brief that he was allowed to review the DOC's training policy but was not allowed to copy it because of security concerns. Doc. 48 at 15.

17

In sum, McClanahan has failed to raise a genuine dispute of material fact concerning whether the Defendants were deliberately indifferent. Because the evidence, when viewed in the light most favorable to McClanahan, does not establish an Eighth Amendment violation, Defendants are entitled to qualified immunity on McClanahan's conditions-of-confinement claim.[7]

### b) Excessive Force Claim

The "core judicial inquiry" in McClanahan's Eighth Amendment excessive force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 6–7. In resolving this inquiry, courts may consider the need for applying force; the relationship between the need for force and the amount of force used; the threat the officers reasonably perceived; any efforts used to lessen the severity of a forceful response; and the extent of the injury inflicted. Id. at 7.

Defendants contend that they are entitled to summary judgment on McClanahan's excessive force claim because there is no evidence that they were personally involved in making McClanahan wear leg irons in the shower and recreation cage and because McClanahan is unable to show that they acted maliciously and sadistically. McClanahan's conclusory allegations in his verified complaint that the Defendants ordered that he wear leg irons in the shower and recreation cage are the only evidence that the Defendants were personally involved in the alleged use of excessive force against McClanahan. See Doc. 1 at 5, 9. McClanahan does not explain when this order was given or how he knows that it was these Defendants who gave it. Further,

_____

[7]In his brief, McClanahan states that "lack of exercise for extended periods for inmates is sufficiently serious deprivation and thus meets requisite harm necessary to satisfy objective test for Eighth Amendment Violation." Doc. 48 at 7. McClanahan has not offered any evidence that he was unable to exercise or that the Defendants were deliberately indifferent to his need to do so.

18

McClanahan has not offered any evidence or reasonable argument in rebuttal to the Defendants' well-supported explanation that McClanahan being made to wear leg irons in the shower and recreation cage was the result of a misinterpretation of the June 28, 2013 security memo rather than an order by the Defendants. See Doc. 42 at ¶¶ 107–111; Doc. 36 at ¶ 22–23; Doc. 38 at ¶ 14–15. Under these circumstances, McClanahan's conclusory allegations that the Defendants ordered that he wear leg irons in the shower and recreation cage are insufficient to create a genuine dispute of material fact concerning whether the Defendants were personally involved in the use of force against him. Because McClanahan would bear the burden of proof on this issue, the Defendants are entitled to judgment as a matter of law.

Even if this Court were to assume that the Defendants somehow ordered that McClanahan had to wear leg irons in the shower and recreation cage, the Defendants would still be entitled to summary judgment on McClanahan's excessive force claim. To survive the Defendants' motion for summary judgment on his excessive force claim, McClanahan must provide evidence from which a jury could find that the Defendants acted maliciously and sadistically for the purpose of causing him harm. Burns, 752 F.3d at 1139; Irving, 519 F.3d at 446. An order by the Defendants requiring that McClanahan wear leg irons in the shower and recreation cage would not create a genuine dispute of material fact concerning whether the Defendants acted with the requisite intent.

McClanahan is serving a life sentence for committing a violent crime. In 1999, he attempted to escape from prison. At the time the Defendants allegedly ordered that McClanahan had to wear leg irons in the shower and recreation cage in the summer of 2013, McClanahan had just been caught attempting to escape a second time. His escape plot involved multiple guns, help from people on the outside, and a plan to "take out" the correctional officers who

19

transported him to the hospital. He also had recently been overheard saying that "the Number one rule of thumb is the only kind of Pig is a dead pig." In view of these facts, the Defendants' alleged order that McClanahan had to wear leg irons in the shower and recreation cage does not support an inference that the Defendants acted maliciously and sadistically for the purpose of causing McClanahan harm. See Branham, 77 F.3d at 628, 631 (holding that inmate's allegations that he was forced to wear leg irons in a secure shower stall for over a month despite never having been charged with a disciplinary offense were insufficient to establish that the defendants acted maliciously and sadistically). The Defendants would have had a reasonable basis for concluding that McClanahan posed a threat to officer safety and institutional security and that he should therefore be subject to restraint requirements beyond that of the typical inmate. Although McClanahan argues that the leg irons were unnecessary because he could not have escaped or harmed anyone when he was in the locked shower and recreation cage, the mere fact that the leg irons may not have been strictly necessary does not establish that the Defendants violated the Eighth Amendment. See Whitley v. Albers, 475 U.S. 312, 319 (1986) ("The infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense."). McClanahan has failed to establish a genuine dispute concerning whether the Defendants acted maliciously and sadistically; as a result, the Defendants are entitled to qualified immunity on his excessive force claim.

## 2. Due Process

In his verified complaint, McClanahan asserts that he "was forced to endure physical discipline resulting in open bleeding wounds when It [sic] was never posted or otherwise made

20

available in writing to me informing me of said change in my treatment or conditions of being forced to wear shackles inside an already secured locked recreation/shower enclosure." Doc. 1 at 10. McClanahan argues that he had a liberty interest in remaining free from restraints in the shower and recreation cage and that the Defendants violated his rights under the Due Process Clause of the Fourteenth Amendment because they failed to provide him notice that his restraint status would be changing. Doc. 48 at 7, 26. Defendants disagree, arguing that McClanahan has no liberty interest that would trigger due process protection.

"A prison inmate only has a liberty interest in a condition of confinement if it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" Key v. McKinney, 176 F.3d 1083, 1086–87 (8th Cir. 1999) (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)). "Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law." Sandin, 515 U.S. at 485. In Sandin, an inmate serving thirty days in disciplinary segregation was only released from his single-person cell for fifty minutes each day for shower and exercise periods, during which he had to wear leg irons and a waist chain. 515 U.S. at 475–76; id. at 494 (Breyer, J., dissenting). The Supreme Court found that the inmate's time in disciplinary segregation was neither a "dramatic departure" from the ordinary conditions of confinement nor a "major disruption in his environment." Id. at 485–86 (majority opinion). Similarly, McClanahan being required to wear leg irons in the shower and recreation cage for less than a month did not impose an atypical and significant hardship on McClanahan in relation to the ordinary incidents of prison life. See id.; Williams v. Ramos, 71 F.3d 1246, 1249–50 (7th Cir. 1995) (per curiam) (finding no atypical and significant hardship where the "catalogue of harms" the inmate suffered during nineteen days in disciplinary segregation included having to wear

21

handcuffs while showering and exercising); Bolding v. Va. Beach Corr. Ctr., No. 3:11CV105-HEH, 2012 WL 1438815, at \*3 (E.D. Va. Apr. 25, 2012) (concluding that prisoner did not have a liberty interest in showering without handcuffs and leg shackles); Alwood v. Wilson, No. 3:07-CV-422 PS, 2008 WL 2444680, at \*1–2 (N.D. Ind. June 13, 2008) (holding that prisoner did not have a liberty interest in showering without shackles). Accordingly, McClanahan had no liberty interest in not wearing leg irons in the shower and recreation cage. Thus, the Defendants are entitled to qualified immunity on McClanahan's due process claim.[8]

## B. Claims against Defendants in their Official Capacities

McClanahan's remaining claims seeking damages from all of the Defendants in their official capacities must be dismissed. First, § 1983 only provides a cause of action against a *person* who, acting under the color of state law, deprives another of his or her federal constitutional or statutory rights. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). The Supreme Court in Will held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983" when sued for damages. Id. Accordingly, § 1983 does not allow McClanahan to sue the Defendants for damages in their official capacities. Id.; see also Arizonans for Official English v. Arizona, 520 U.S. 43, 69 n.24 (1997) ("State officers in their official capacities, like States themselves, are not amendable to suit for damages under § 1983."). Second, absent consent by the state or congressional abrogation of immunity, "the Eleventh Amendment prohibits federal-court lawsuits seeking monetary damages from individual state officers in their official capacities because such lawsuits are essentially 'for the

---

[8]McClanahan in his verified complaint alleges that his "Equal protection" rights were violated. Doc. 1 at 4. He does not discuss any equal protection violation in his brief, however. To the extent that McClanahan is still raising an equal protection claim, Defendants are entitled to summary judgment on this claim because McClanahan has failed to offer any evidence that the Defendants violated his equal protection rights. See Phillips v. Norris, 320 F.3d 844, 848 (8th Cir. 2003) (listing elements of equal protection claim).

22

recovery of money from the state.'" Treleven v. Univ. of Minn., 73 F.3d 816, 818 (8th Cir. 1996) (footnote omitted) (quoting Ford Motor Co. v. Dep't of the Treasury, 323 U.S. 459, 464 (1945)). South Dakota has not consented to official capacity suits under § 1983 for money damages, § 1983 has not abrogated South Dakota's Eleventh Amendment immunity, and the Defendants have raised Eleventh Amendment immunity as a defense in this case. Doc. 17 at 11– 12; Doc. 34 at 4 n.1. Thus, the Eleventh Amendment prevents this Court from having jurisdiction over McClanahan's claims for damages against the Defendants in their official capacities. Nix v. Norman, 879 F.2d 429, 431 (8th Cir. 1989) ("The Eleventh Amendment presents a jurisdictional limit on federal courts in civil rights cases against states and their employees.").

However, suits against state employees in their official capacities that seek only prospective, injunctive relief are allowed by § 1983, Will, 491 U.S at 71 n.10 (explaining that state officials are "persons" under § 1983 when sued for injunctive relief in their official capacities), and are not barred by the Eleventh Amendment, Ex Parte Young, 209 U.S. 123, 157– 60 (1908) (holding that state officials may be sued in their official capacities for prospective injunctive relief without violating the Eleventh Amendment). In the "Request for Relief" section of his verified complaint, McClanahan requests "an order protecting me from any DOC staff or Administrations Staff from seeking retaliation of any form resulting in suit." Doc. 1 at 7. He also requests an "order for protection against unusual punishment restraints at any time inside a secure locked Rec/shower enclosure, unless person/s is physically violent, towards staff." Doc. 1 at 7.

As the plaintiff in this case, McClanahan bears the burden of establishing that he has standing under Article III of the Constitution to request injunctive relief. Park v. Forest Serv. of

23

U.S., 205 F.3d 1034, 1036–37 (8th Cir. 2000).  To demonstrate standing, McClanahan must establish an injury in fact; a causal connection between the injury and the alleged conduct of the Defendants; and a likelihood that the remedy he seeks will redress the alleged injury.  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102–03 (1998).  When, as here, the plaintiff is seeking injunctive relief, "the 'injury in fact' element of standing requires a showing that the plaintiff faces a threat of ongoing or future harm."  Park, 205 F.3d at 1037.  Evidence that a plaintiff suffered an injury in the past does not alone establish that the plaintiff has standing to seek injunctive relief.  See O'Shea v. Littelton, 414 U.S. 488, 495–96 (1974) (holding that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects").  A plaintiff's speculation that he may suffer injury in the future is likewise insufficient.  City of L.A. v. Lyons, 461 U.S. 95, 102 (1983) (explaining that a "conjectural" or "hypothetical" threat of injury does not establish standing).  Instead, as the Supreme Court made clear in Lyons, the plaintiff must show that "the injury or threat of injury" is "'real and immediate'" to have standing to seek injunctive relief.  Id.

In Lyons, the plaintiff sought injunctive relief barring police officers from the City of Los Angeles from using chokeholds unless suspects were threatening the officers with the immediate use of deadly force.  Id. at 98.  The Supreme Court held that the plaintiff did not have standing to seek such relief because he had failed to demonstrate that there was a sufficient likelihood that the police would subject him to a chokehold in the future.  Id. at 105–110.  Although the plaintiff had been subjected to a chokehold in the past and alleged that the police officers routinely applied chokeholds when they were not threatened by deadly force, the Supreme Court

24

concluded that these facts fell short of establishing that the plaintiff faced a real and immediate threat of future harm. Id. 105–106.

Like the plaintiff in Lyons, McClanahan has failed to demonstrate that there is a sufficient likelihood that he will suffer harm from being shackled in the shower and recreation cage in the future. McClanahan has not offered any evidence that the Defendants have an ongoing policy of restraining inmates in the shower and recreation cage in a manner that violates the Eighth Amendment or that other inmates have been restrained in such a manner. Nor has McClanahan established a material issue of fact concerning whether the Defendants violated his Eighth Amendment rights when he was forced to wear leg irons in the shower and recreation cage from late June or early July of 2013 to approximately July 16, 2013. Further, McClanahan has not offered any evidence that he is still being held in the SHU—where he presumably would be required to shower and exercise in the cage and there might be a greater chance that he would be subject to additional restraint requirements when outside of his cell—or that it is likely that he will be held there in the future. In short, McClanahan has failed to establish that he faces a real and immediate future threat of being restrained in the shower and recreation cage in a manner that violates his rights under the Eighth Amendment. See id.; Knox v. McGinnis, 998 F.2d 1405, 1413–1415 (7th Cir. 1993) (holding that prisoner's speculation that he could be returned to segregation did not give him standing to seek injunctive relief against prison's use of "black box" restraining device on all inmates in segregation).

In regard to his request for an order restraining "DOC" and "Administrations" staff from retaliating against him for filing this law suit, McClanahan has not offered any evidence in his verified complaint or the affidavits and notarized statements he filed to suggest that he is being retaliated against. However, McClanahan did file a July 21, 2014 letter from his attorney David

25

Palmer to the South Dakota Attorney General's Office, in which Palmer writes that McClanahan had reported that after the Defendants were served with this § 1983 lawsuit, Al Madson, who was the manager of McClanahan's cell block, shook down McClanahan's cell and removed some legal papers relating to this case, McClanahan's escape charge, and a state habeas petition. Doc. 18-2 at 1–2. Palmer also wrote that McClanahan had reported being denied access to the law library. Doc. 18-2 at 2. Palmer opined in the letter that it appeared that these actions were being taken to retaliate against McClanahan for filing his § 1983 suit. Doc. 18-2 at 1–2. Along with Palmer's letter, McClanahan submitted his own letter to this Court stating that legal documents were taken from his cell and that he was being denied access to the law library. Doc. 18-3. He also submitted requests that he had sent to prison staff requesting copies of legal documents and expressing frustration over not receiving the copies sooner. Doc. 18-1.

McClanahan then sent a letter to the Clerk of Court stating that he had "been having serious issues with the prison authorities, retaliating and harassing my right to access the courts or receive Mail from your office." Doc. 28. It appears from the letter that the basis for McClanahan's complaint was that he did not receive an October 15, 2014 order in this case until October 29, 2014. Doc. 28. In his brief in opposition to Defendants' motion for summary judgment, McClanahan alleges that "prison officials were and still are enterfering [sic] with Plaintiffs [sic] legal mail, Legal access to the courts and access to legal Books materials excetra [sic]." Doc. 48 at 6. Well over a month after Defendants' motion for summary judgment had been fully briefed, McClanahan filed a motion for "complete copies of all documents" he had filed. Doc. 53. In his motion, McClanahan alleged that "prison authorities" took his "Documentation." Doc. 53. A lawyer for the South Dakota Attorney General's Office then sent a letter to the Clerk of Court stating that SDSP staff had informed him that no legal paperwork

had been taken from McClanahan and that McClanahan had not filed any grievances claiming confiscation of his paperwork. Doc. 54. According to the attorney, McClanahan had approached his unit coordinator with a box of legal paperwork in the spring of 2015 and asked the coordinator to "get rid of it." Doc. 54. Considering McClanahan's request odd, the coordinator placed the box in storage.

Most recently, McClanahan, without any explanation for doing so, filed several documents concerning his desire to bring his legal materials with him to his state habeas proceeding. Doc. 55. These documents include a "Request for Administrative Remedy" in which McClanahan asks to be allowed to take his legal documents with him to court, a response from Warden Young stating that the SDSP is not responsible for court hearing transports and that McClanahan should contact the sheriff's office with his concerns, and an order from a state court judge directing the SDSP to allow McClanahan to bring his legal documents to the hearing in his habeas case. Doc. 55.

None of the documents McClanahan has filed are sufficient to establish that he faces a real and immediate threat of retaliation. The documents are either inadmissible hearsay or unsworn allegations from McClanahan, neither of which constitute competent evidence at the summary judgment stage. See Novotny v. Tripp Cnty., S.D., 664 F.3d 1173, 1178 (8th Cir. 2011) (explaining that hearsay evidence is insufficient at the summary judgment stage); Mays v. Rhodes, 255 F.3d 644, 648 (8th Cir. 2001) (holding that unsworn statements in inmate grievance forms could not defeat summary judgment motion). Although McClanahan is proceeding pro se, he is "not excused from failing to comply with substantive and procedural law." Burgs v. Sissel, 745 F.2d 526, 528 (8th Cir. 1984) (per curiam); see also Bennett v. Dr Pepper/Seven Up, Inc., 295 F.3d 805, 808 (8th Cir. 2002) (explaining that a party's "pro se status did not entitle him to

27

disregard the Federal Rules of Civil Procedure" (quoting Carman v. Treat, 7 F.3d 1379, 1381 (8th Cir. 1993))).[9] Because McClanahan has failed to establish that he is facing a real and immediate threat of future harm, this Court lacks jurisdiction to entertain his requests for injunctive relief. See Ark. Right to Life State Political Action Comm. v. Butler, 146 F.3d 558, 560 (8th Cir. 1998) ("Standing is, of course, a threshold issue in every case before a federal court: If a plaintiff lacks standing, he or she cannot invoke its jurisdiction.").

## IV. Conclusion

For the reasons stated above, it is hereby

ORDERED that Defendants' Motion for Summary Judgment, Doc. 33, is granted. It is further

ORDERED that McClanahan's claims for damages and injunctive relief against Defendants in their official capacities are dismissed for lack of jurisdiction. It is further

ORDERED that McClanahan's Motion for Complete Copies of all Documents he has submitted for Filing, Doc. 53, is denied without prejudice to refiling. If the documents McClanahan seeks are not in the box his unit coordinator placed in storage, McClanahan may file another motion in this Court explaining which documents he needs.

DATED this 5th day of February, 2016.

---

[9]Even if McClanahan had demonstrated that he had standing to request an injunction prohibiting the Defendants from retaliating against him, the Defendants would be entitled to summary judgment because McClanahan's request for injunctive relief is not sufficiently related to the underlying claims in his verified complaint. See Martin v. Keitel, 205 F. App'x 925, 928–29 (3d Cir. 2006) (per curiam) (holding that plaintiff's request to enjoin defendants from retaliating against him was legally deficient because it had no relation to the underlying claim in his § 1983 suit); Devose v. Herrington, 42 F.3d 470, 471 (8th Cir. 1994) (per curiam) ("[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint.").

28

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE